ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2012 JUN -1  PM 3: 46

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SCOTT AND SUSAN MEYERS, and ROCKY MOUNTAIN CHOPPERS, LLC | § § § § | |
| Plaintiffs | § § | CASE NO. _____ |
| v. | § § § | 4-12CV-352-Y |
| TEXTRON, INC., ERNST & YOUNG LLP, AND TEXTRON FINANCIAL CORPORATION, | § § § § § § | |
| Defendants. | § § | |

## ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT AND JURY:

**COME NOW** Plaintiffs, Scott and Susan Meyers ("Meyers") and Rocky Mountain Choppers, LLC ("RMC" or, collectively with Meyers, the "Plaintiffs") and file this Original Complaint, complaining of Defendants Textron, Inc. ("Textron"), Ernst & Young LLP ("E&Y") and Textron Financial Corporation ("TFC") and for causes of action would show:

## PRELIMINARY STATEMENT

1. In 2008, Scott and Susan Meyers were considering acquiring the assets of American IronHorse Motorcycle Company ("AIMC"). Because of the state of the national economy, the Meyers were not only concerned about the viability of AIMC but were also keenly aware of the importance of the stability of their commercial lender. TFC had been the asset based lender for AIMC and was actively marketing its collateral,

1

the assets of AIMC. The Meyers and their professionals investigated TFC and its parent company, Textron before committing to fund the acquisition of AIMC's assets. Part of that investigation included a thorough study of the most recent public filings of both Textron and TFC. Those documents, which were audited by E&Y, contain inaccurate and misleading financial information that was meant to deceive and defraud the Plaintiffs and the public.

2.  A 10-K filing represents the most accurate and honest picture of the true financial condition of a company. The 10-K filing is the most critical report that a publicly traded company issues as it includes in depth information about the company's performance during the last year and provides a vision of the future. Mr. Meyers' first act of due diligence was to read the Textron 2007 Annual Report, which was filed on February 20, 2008 and is readily available to the general public online. The cover of that 2007 report had only four words on it and that left Mr. Meyers with a very clear impression. Those words are POWERFUL PERFORMANCE: POWERFUL FUTURE. Considering the state of the national economy, it was critical to the Plaintiffs to ensure that Textron was a stable and reliable lender. Textron's public filings in February 2008 boast of record earnings and a future of growth. The Plaintiffs were enticed by the prospect of doing business with the Textron companies by the information included in the Textron 2007 Annual Report.

3.  Because of their justifiable reliance on Textron and TFC's public filings, the Meyers were fraudulently induced to lend the money that was used to purchase the AIMC assets and to support their wholly owned company, AIH Acquisitions, LLC ("AIHA") to enter into a lending relationship with TFC. Ultimately, the acquisition, the

lending relationship and the business would fail because of facts and circumstances already known by the Defendants at the time the Meyers entered the scene. Because of the actions of Textron, TFC and E&Y, the Meyers have suffered actual financial losses exceeding well over $10 million.

**PARTIES**

4. The Plaintiffs, Scott and Susan Meyers are individuals residing in the State of Texas. They reside at 504 N. Bailey Avenue, Fort Worth, Texas, 76107. They may be served through their counsel of record, Cynthia W. Cole, Bell Nunnally & Martin, LLP, 3232 McKinney Avenue, Suite 1400, Dallas, Texas 75204.

5. The Plaintiff, Rocky Mountain Choppers, LLC is a company organized under the laws of the State of Montana. Its current business address is 504 N. Bailey Avenue, Fort Worth, Texas, 76107. It may be served through its counsel of record, Cynthia W. Cole, Bell Nunnally & Martin, LLP, 3232 McKinney Avenue, Suite 1400, Dallas, Texas 75204.

6. The Defendant Textron Financial Corporation is a corporation organized under the laws of the State of Delaware. Its principle place of business is in Providence, Rhode Island. TFC is licensed and authorized to do business in Texas and may be served through its Registered Agent for Process, CT Corporation, at 350 N. St. Paul Street, Dallas, Texas 75201.

7. The Defendant Textron, Inc. is a corporation organized under the laws of the State of Delaware. Its principle place of business is in Providence, Rhode Island. Textron is licensed and authorized to do business in Texas and may be served through its

Registered Agent for Process, CT Corporation, at 350 N. St. Paul Street, Dallas, Texas 75201.

8. The Defendant E&Y is a limited liability partnership headquartered in New York and organized under the laws of the State of New York. E&Y is licensed and authorized to do business in Texas and may be served through its Registered Agent for Process, CT Corporation, at 350 N. St. Paul Street, Dallas, Texas 75201.

## JURISDICTION AND VENUE

9. The matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars. This Court has jurisdiction based on diversity of citizenship and the amount in controversy. 28 U.S.C. § 1332(a)(2).

10. Venue is proper in this Court because Plaintiffs Scott and Susan Meyers reside in Fort Worth, Texas. Moreover, all or a substantial part of the events or omissions giving rise to the claims raised herein occurred in Tarrant County.

## FACTUAL BACKGROUND

11. On June 4, 2008, the Meyers purchased the assets of American IronHorse Motorcycle Company, Inc. ("AIMC"), which was placed into involuntary bankruptcy in March 2008. TFC was engaged in asset based lending and served as a primary lender since 2002 to AIMC prior to its bankruptcy. TFC also supplied credit facilities to AIMC's dealer body to finance dealer floor plans for the purchase of new products from AIMC. During this five year time period, TFC amended AIMC's credit agreement sixteen times, never once calling or accelerating the loan despite AIMC's actual financial performance - always losing money and never generating cash. Over the years, and as a

result of these credit arrangements, TFC acquired through repossession hundreds of new motorcycles from AIMC's dealers.

12. TFC had their internal auditors review the operations of the borrowers on a regular basis. This information was retained in the TFC loan files that E&Y had access to during their audit. When performing its audits of the Textron companies, E&Y would have had access not only to the records of the poorly performing AIMC loan but also all of the other failing loans in TFC's asset based lending portfolio. The most important audit procedure in auditing a financial institution is to evaluate the collectability of the loan receivables by reviewing the borrower's loan files held by the lender.

13. In April 2008, the Meyers entered negotiations with TFC relating to the asset purchase from AIMC. TFC was AIMC's pre-petition secured lender and post-petition debtor in possession lender and therefore, possessed a super-priority security interest in all of AIMC's assets. Because of its security interest in AIMC's assets, TFC retained the right to credit bid its claim in the 363 sale of AIMC's assets and had final approval of the selection of both the stalking horse and successful bid.

14. A formal meeting was held in Chicago in 2008 between the Plaintiffs and TFC. Although they were invited by the Plaintiffs, no AIMC representatives attended the Chicago meeting. Only TFC participated as they controlled and benefitted from the sale of the AIMC assets. At that meeting, TFC officials advised the Plaintiffs that they were retaining $7 million out of the total $12 million of the raw materials inventory as TFC had concluded that they would not sell and lend money on obsolete inventory to the buyer of the business. That statement gave the Plaintiffs great comfort that TFC had cleaned the assets of all stale and obsolete inventory and would only be selling viable

assets. On June 4, 2008, TFC sold and transferred the AIMC loan to the Meyers secured by $5.1 million of raw materials. Through discovery, the Plaintiffs have learned that a report was issued to TFC in August 2007 by an advisory firm engaged by TFC, which stated that there was 2.5 year supply of motorcycles at the AIMC's dealerships and that there was obsolete raw material of $9 million dollars. Moreover, a February 2008 email from a TFC account executive reveals that TFC was going to retain $9.9 million of the obsolete raw materials as documented by a certified report held by Textron. Uncontroverted evidence clearly shows that TFC knew on June 4, 2008 that there was only $2 million of viable raw materials, yet they sold to the Plaintiffs $5.1 million of inventory. By TFC transferring $5.1 million in the AIMC loan receivable to the Plaintiffs in this transaction, TFC was hiding $3 million in additional loan losses.

15. The reserve for loan losses is a calculation that is based on information that is readily obtainable and one that can be prepared in a manner consistent with the true operations of the business. The question arises: if Textron had reports that clearly showed the AIMC loan was collateralized by worthless inventory, why didn't E&Y in their audit demand an increase in the loan loss reserve for this situation? How could E&Y allow TFC to loan money on obsolete inventory of $3 million without increasing the loan loss reserve? Evidence in this case clearly proves that TFC sold, lent money and charged interest on ineligible inventory that does not comply with the legal requirements established by the Loan and Security Agreement (the "LSA") prepared by TFC and signed by all parties. TFC violated the LSA by lending money on inventory that was ineligible and E&Y should have seen by reviewing the TFC loan files that the loan was

fabricated to hide the loss. These facts have been admitted in depositions of TFC management and officers in sworn testimony.

16. As AIMC's lender during its bankruptcy case, TFC required and received weekly reporting related to sales, production and dealer relationships from AIMC. These reports combined with monthly on-site audits of raw material inventory and finished goods provided TFC with an infinite and independent understanding of the status of AIMC's business. Moreover, as the floor plan financer for more than ninety percent (90%) of AIMC's dealers, TFC possessed details about the dealer network as a whole that no outside party could access other than those parties auditing the TFC files.

17. The Meyers investigated the assets that were being sold by TFC; but were equally concerned with the status and strategy of the commercial lender that they would be relying upon to provide operational cash. That concern led Meyers to seek out the most recent annual reports of Textron and TFC. Based on information now discovered by the Plaintiffs, it is clear that Textron and TFC engaged in serious accounting fraud in an effort to conceal their true financial status from the public.

18. The cover of the 2007 Textron Annual Report contains four words, "Powerful Performance. Powerful Future." Encouraged by that statement, Plaintiffs dug deeper to gain a full understanding of the status of this company. On page four, Lewis Campbell, Chairman, President and Chief Executive Officer of Textron informs the public that "The numbers speak for themselves, but they don't tell the whole story." The unsuspecting public could not have known that the numbers being provided by Textron with E&Y's approval did not reflect any part of the actual story of Textron and TFC. On page six of the 2007 Annual Report, Campbell continues his misleading rhetoric by

adding, "At Textron Financial, High Credit Quality and Customer Service Underscore Another Year of Growth." Even a sophisticated consumer would be reasonable in believing Campbell's words to mean that TFC was a vessel for certain growth.

19.     Hidden on page twenty-three of the 2007 Annual Report, Textron finally recognizes what many other agencies had already reported about the U.S. economy by stating, "In 2007, the increase in nonperforming assets as a percentage of owned finance assets for asset-based lending and distribution finance, compared with 2006, relate to weakening U.S. economic conditions, which began to have a negative impact on borrowers in certain industries." A downward movement in the economy would have had an impact on the loans held by Textron during this time. In 2007, Textron actually lowered their reserve for loan losses. Textron cannot justify the lowering of the reserves on its loan accounts considering its own opinion that the economy was weakening. Accordingly, the reserves should have increased in 2007. Rather, its overall 2007 reserve actually dropped to $89 million on $8.6 billion of receivables from what was reported in 2003, a reserve of $119 million on $5.1 billion of receivables. Where was E&Y at this time? The evidence clearly demonstrates that the reserves were insufficient. TFC had increased its total loan balances dramatically and TFC even stated that the economy was weakening so how could the loan loss reserve actually be reduced? Other prominent lending institutions had increased their loan reserves in 2007. Why did E&Y approve TFC reducing theirs? The only reason that the reserves were reduced was to further the Textron companies agenda of fraudulently misleading the public by fabricating a "Powerful Performance" and making bad faith promises of a "Powerful Future."

20. There is a conflict within the Annual Report. If Textron believed that the economy was "weakening," then the reserve numbers should have increased not decreased. By applying the same rate that was utilized by Textron in 2003, Textron would have been required to set up a reserve of $199 million in 2007. Textron overstated reported income before taxes by $110 million in 2007 (which represents 50% of the reported income before taxes of TFC 2007 10-K) if applying the rate used by Textron in the past. The $110 million only identifies a small part of the true error. A more refined calculation would report an error much larger than the $110 million, as economic times were worse in 2007 versus 2003, which is stated by Textron in its Annual Report 2007.

21. In 2004, Mr. Ted French the CFO of Textron, Inc. added managing TFC to his job description when he was named Chairman and CEO of TFC. Under Mr. French's reign, TFC began to reduce its reserve for loan losses as a percentage of loans outstanding thereby generating artificially inflated earnings from TFC for many years. By having one person act as CFO of a parent and CEO of a subsidiary, the Textron companies ventured into the shady waters once inhabited by Enron, which allowed Andrew Fastow, the CFO of Enron, to operate Enron subsidiaries as a common practice.

22. Considering Textron's liberal lending practices and the sixteen liberal amendments made to the AIMC loan since 2003, the reserve rate should have to be increased at least three times higher to 4% of the loan receivables which would have mandated a reserve of $350 million. Even if Textron had reported a more realistic reserve estimate of $350 million in 2007, another $442 million would still have had to have been recognized in the following year as Textron eventually reported $792 million

in write-offs in 2008 and 2009. Plaintiffs do not dispute that the downfall in the economy may have impacted a portion of TFC's loan portfolio. However, at least half of the $792 million write-off should have been recognized by TFC through the normal course of business over the years leading up to 2007.

23. Providing accurate information to the public was not Textron's ultimate goal. In fact, recognizing a more appropriate reserve in 2007 would not have driven Textron's stock price to the record high price of $73.38 a share in 2007 allowing its CEO and CFO to cash out $47 million of their personal stock in early 2008. While it is certain that with accurate reporting Textron's stock prices would have dropped gradually during this time in accordance with market trends, Textron's misleading accounting practices caused the eventual massive losses suffered by shareholders when the market delivered a 95% drop to $3.75 on March 6, 2009. Shareholders of Textron would not have been harmed by Textron's accounting if the appropriate reserves were reported to the SEC in the years leading up to 2007. The 2007 Annual Report enticed the Meyers into lending money to AIHA just as it enticed the public to buy stock in Textron.

24. The deliberately inaccurate annual reports, which were audited, reviewed and approved by E&Y, concealed the true financial status of Textron and TFC's loan portfolio and created a highly misleading picture of Textron's actual stability. At a time when it was critical for the Plaintiffs to make informed decisions about whether to enter into a relationship that depended on Textron and TFC's future, E&Y assisted the Textron companies in defrauding the public about their deteriorating financial condition in 2007.

25. The Defendants knew that the annual reports violated Generally Accepted Accounting Principles ("GAAP"), which require that such financial statements (a) not be

misleading, (b) fairly disclose the company's financial position, and (c) not omit material information necessary to fairly present the financial position of the company. As public auditor for Textron and TFC, E&Y has the obligation to ensure that the financial statements complied with GAAP and did not provide misleading information to the public. Instead of satisfying that obligation, E&Y gave a clean opinion erroneously stating that the Textron companies' reports complied with GAAP. By doing so, E&Y directly participated in accounting fraud, helped Textron and TFC mislead the public as to their true financial conditions and collected more than $11 million in fees for its services in 2007. The most basic accounting practice mandates that a company must match expenses with revenues. Losses should be recorded at the time they are known and incurred. This concept is neither complex nor wavering. E&Y should have corrected its client's deliberate deceptions.

26. Additionally, on page six of the 2007 Annual Report, Campbell paints a misleading picture when he specifically describes TFC, "We're proud of our disciplined approach to growth at Textron Financial, as evidenced by our continued solid credit quality." It is unclear how Campbell could have believed that TFC possessed solid credit quality in 2007 when it had to write off more than $792 million in bad loans less than two years later. By writing off $792 million in losses it not only wipes out TFC's previous year's reported earnings but it indicates that the last four years of reported profits were false.

27. Likewise, during 2007, Textron's finance segment's receivables grew by 9% to $11 billion including off balance sheet receivables, as only $8.6 billion was

identified. In yet another attempt to conceal its true financial status, Textron utilized the off-balance sheet approach to financial growth.

28. TFC's 2007 balance sheet reveals that the total finance receivables increased by 3.4% in 2007 while total debt increased by 6.5%. This would indicate that the receivables themselves are not generating cash flow as TFC had to borrow more money than its loans were producing. Likewise, TFC's interest income went up 2.9% in 2007 while interest expense went up 13.1% again indicating that TFC was not collecting more money from its own lending practice and had to borrow more money itself. Finally, the TFC cash flow statement reveals that cash flow from operations decreased by 22% in 2007 amounting to $76 million. Cash flow has always been an indicator on how well a business is being run and when cash flow turns south that is a indicator that the company is in trouble. Considering these facts, it is completely unclear how the Defendants can support the information included in Textron and TFC's 2007 annual reports.

29. The Plaintiffs relied upon the information published by Textron and TFC and audited by E&Y when deciding not only to move forward with the acquisition of AIMC's assets but also, when they offered TFC a shareholder position in their new venture because they believed in the "Powerful Future" that TFC and Textron disclosed in their public filings.

30. Because of the information provided by the Defendants, the Plaintiffs made the choice to pursue a lending commitment from TFC for their new entity. After much negotiation, TFC agreed to a five year lending commitment, which was sufficient to satisfy the Plaintiffs' concerns about surviving any economic downturn.

31. In September 2008, only three months after the Plaintiffs funded the AIHA acquisition Eric Hubbard visited the AIHA facility and told Scott Meyers to find a new lender to replace TFC. Hubbard covered his ears and said "you didn't hear it from me" and then informed Scott Meyers that Textron was exiting the asset based lending business. TFC made its official announcement in October 2008 reducing its five year lending commitment to five months. This notification was completely contrary to TFC's promises to the Plaintiffs and severely damaged AIHA's ability to thrive.

32. TFC made numerous promises to the Plaintiffs to induce them into the AIHA transaction. It now appears that Textron and TFC's goal was to use any means necessary to keep the stock prices high to allow the CEO and CFO to sell their personal stock, to prolong its deception and to hide its true financial condition. During this time of public deception, the Chairman and CEO of TFC and the Chairman and CEO of Textron sold $47 million of their personal stock in the first half of 2008 just after reporting a record earnings year on February 20, 2008.

33. This is not the first time that these same Textron executives have encountered reporting issues. Lewis Campbell, Textron's CEO, who personally benefitted from Textron's misleading reporting practices, was on the Board of Bristol-Myers when it reported in 2003 that it was restating its financial statements for three years as it had over recorded approximately $2.5 billion in revenues and $900 million in earnings. Bristol-Myers had persuaded wholesalers to buy more drugs than they needed by offering discounts and other incentives to meet their sales goals. All this is very similar to what was occurring with Textron in lending money to AIMC's dealers and thereby creating the saturation of the market that was hidden for a while through

misleading accounting. Textron blames the downfall in the U.S. economy for the write-offs that they incurred. But Textron is the one who created the market saturation through its liberal lending practices that created the 2.5 year supply of motorcycles at the AIMC dealerships. Through misleading accounting and failure to disclose critical information to the Plaintiffs, the Defendants intentionally defrauded and caused significant harm to the Plaintiffs.

34.     Long before the Plaintiffs purchased AIMC's assets, Textron saturated the market through liberal and dangerous lending practices that created an insurmountable obstacle in its path to profitability. When it was faced with the fallout from its reckless lending practices, Textron chose to lie to the Plaintiffs about the damage it had done to the AIMC motorcycle market and the viability of the assets it sold to the Plaintiffs in an attempt to limit its own losses. Textron wove a web of lies and deception through fraudulent reporting to the SEC with the help of E&Y, which supported Textron's fraud in its efforts to continue collecting high dollar audit fees. By applying the appropriate audit procedures utilized by all professional audit firms, E&Y should have easily seen that the collectability of the TFC loans was in serious trouble in 2007. In the most basic accounting classes, the student learns that revenues must match expenses. Incentivized by the lucrative fees paid by Textron and TFC, E&Y intentionally ignored GAAP and failed to perform the service that the public depends on it to perform. In its 2007 Annual Report, Textron promised investors that a Powerful Future was in the making while it had clear knowledge that the future was grim for everyone but the CEO and CFO who had just enough time to sell $47 million in personal stock before the true status of the Textron companies was exposed to the detriment of the Plaintiffs and the public. The Defendants

intentionally defrauded the Plaintiffs for their own selfish motives and it is for that fraud that the Plaintiffs now sue.

## COUNT I FRAUD

35. The Plaintiffs incorporate all preceding allegations as if set forth herein verbatim.

36. The Plaintiffs sue the Defendants for fraudulently preparing, submitting, auditing and publishing the Textron and TFC annual reports, which the Plaintiffs relied upon when agreeing to fund the AIHA acquisition.

37. The Plaintiffs sue for fraud because the Defendants fraudulently misrepresented Textron and TFC's true financial status to the Plaintiffs and the public in general.

38. The Defendants' fraud was accomplished through false misrepresentations of material fact, which consisted of both words and conduct. Those misrepresentations included: (a) false statements of fact; (b) false promises of future performance; and (c) non-disclosure of material facts when there was a duty to disclose. The Defendants pursued their scheme of fraud through misrepresentations it knew were false when made and with the specific intent that the public would act and rely upon them. The Plaintiffs reasonably relied upon these false assurances and misrepresentations proximately causing them past and ongoing damages.

39. The Defendants' deceptions and knowing misrepresentations have proximately caused substantial damages to the Plaintiffs for which damages the Plaintiffs now sue.

## PUNITIVE DAMAGES

40. The Plaintiffs incorporate all preceding allegations.

41. The acts of the Defendants recited above were committed with malice as that term is defined by Tex. Civ. Prac. & Rem. Code § 41.001. The Plaintiffs, therefore, request that it recover exemplary damages from the Defendants separately in an amount sufficient to deter the Defendants from ever again engaging in such conduct, in the maximum amounts permitted by law. Furthermore, the Defendants' fraudulent conduct was characterized by dishonesty of purpose and intent to deceive.

## OTHER RELIEF

42. The Plaintiffs seek recovery of both prejudgment and post-judgment interest as allowed by law.

43. All conditions precedent to recovery herein have been satisfied.

## JURY DEMAND

44. The Plaintiffs demand a trial by jury on all claims and causes of action.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiffs, respectfully pray that the Defendants be cited to appear and answer herein and upon final trial hereof be awarded relief as follows:

A. actual damages to which it is justly entitled and caused by their conduct;
B. punitive damages against the Defendants in the maximum amount allowed by law;
C. prejudgment interest as allowed by law;
D. post-judgment interest as allowed by law; and
E. all other and further relief, at law or in equity, special or general, to which Plaintiffs may be justly entitled under the circumstances.

Respectfully submitted,

By: *Cynthia Cole* (signature)
Cynthia Cole
State Bar No. 24035579
cyndeec@bellnunnally.com

BELL NUNNALLY & MARTIN LLP
3232 McKinney, Avenue, Suite 1400
Dallas, Texas 75204
Telephone: (214) 740-1400

**ATTORNEY FOR PLAINTIFFS**

**ORIGINAL**

%JS 44 (TXND Rev. 2/10)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Scott and Susan Meyers, and Rocky Mountain Choppers, LLC

**DEFENDANTS**
Textron, Inc., Ernst & Young LLP, and Textron Financial Corporation

(b) County of Residence of First Listed Plaintiff: **Tarrant County, TX**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: **Providence County, RI**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Cynthia W. Cole, Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400, Dallas, Texas 75204

Attorneys (If Known)

**4-12CV-352-Y**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / ☒ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 530 General | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 540 Mandamus & Other | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights / ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1332

Brief description of cause:
Fraud

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) PENDING OR CLOSED: (See instructions)

JUDGE _____ DOCKET NUMBER _____

DATE 6/1/12

SIGNATURE OF ATTORNEY OF RECORD
[signature]

**FOR OFFICE USE ONLY**

RECEIPT # FWD170058   AMOUNT $350.00   APPLYING IFP   JUDGE   MAG. JUDGE